**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.T.M.-C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1213 EDA 2023 |

Appeal from the Decree Entered May 2, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000083-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: S.T.M.-C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1214 EDA 2023 |

Appeal from the Decree Entered May 2, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000084-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: J.E.M.-C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1215 EDA 2023 |

Appeal from the Decree Entered May 2, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000085-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: E.T.M.-S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

:
:
:
APPEAL OF: C.M., MOTHER      :
:
:
:
:
:    No. 1216 EDA 2023

Appeal from the Decree Entered May 2, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No:  CP-51-AP-0000086-2023

BEFORE:  BOWES, J., STABILE, J., and DUBOW, J.

MEMORANDUM BY STABILE, J.:          **FILED MARCH 28, 2024**

C.M. (Mother) appeals the May 2, 2023 decrees involuntary terminating her parental rights to her four biological children: T.T.M.-C. (DOB: 8/2009), J.E.M.-C. (DOB: 4/2011), S.T.M.-C. (DOB: 8/2013), and E.T.M.-S. (DOB: 9/2017).  After review, we affirm the termination decrees.

We glean the relevant factual and procedural history of the above-captioned matters from the certified record, particularly the trial court opinion, the parenting capacity evaluation of Mother and the dependency dockets of the children.  On June 5, 2019, Philadelphia Department of Human Services ("DHS") received a general protective services ("GPS") report concerning Mother's home.  N.T., 5/2/23, at 21.  The report contained several allegations: (1) there were maggots, dirt and a lot of trash on the floors, and rats in the home; (2) the home was infested with bedbugs and head lice; (3) one of the children was sexually abused and refused to disclose because the person threatened to kill them; (4) the children were physically abused; (5) the adults smoked marijuana and used cocaine around the children; (6) approximately

- 2 -

five children and five adults resided in the home; and (7) Mother and maternal grandmother walked around the home naked.[1]  **Id.** at 21-22; Trial Court Opinion, 8/14/23, at 2-3.  The same day, DHS met with Mother and the children at the home, and Mother admitted the home was infested with bedbugs.  Trial Court Opinion, 8/14/23, at 3.  DHS also observed the home was dirty and E.T.M.-S. did not have an appropriate sleeping area.  **Id.**

The next day, June 20, 2019, DHS received a child protective services ("CPS") report regarding physical abuse of the children that occurred on June 17, 2019.  N.T., 5/2/23, at 22.  Police were called to the home because of alleged physical abuse of T.T.M.-C. and J.E.M.-C. by Mother and her paramour (and father of E.T.M.-S.), R.S.  Trial Court Opinion, 8/14/23, at 4.  It was reported that due to the history of domestic violence, Mother was afraid of R.S. and would not intervene to protect T.T.M.-C.  **Id.** at 3-4.  Mother was being arrested when DHS arrived at the home.  **Id.** at 4.

The children were transported to the special victims unit wearing dirty clothing and had an odor.  **Id.** at 5.  The children stated R.S. hit them with a belt and a wooden stick with "staples."  **Id.**  T.T.M.-C. had red marks and bruising on the left side of his face, dark purple and red bruising on his left arm, and red and purple bruising on his back and front of his right forearm.  **Id.**  T.T.M.-C. also reported R.S. used his hand to choke him.  **Id.**  Afterward,

---

[1] This report was determined to be valid.  Trial Court Opinion, 8/14/23, at 3.

T.T.M.-C. was forced to stay in his room for two days so no one would see his injuries, and he was not fed during this time. *Id.* J.E.M.-C. reported R.S. used a belt to choke her and had slight bruising on her left shoulder and right arm and reported bruising on her back and buttocks. *Id.* Both T.T.M.-C. and J.E.M.-C. reported: (1) R.S. and Mother hit them; (2) they suffered severe pain; (3) they had gone long periods of time without food; and (4) the home was infested with bedbugs and fleas. *Id.*

DHS spoke with the maternal aunt, who had previously resided in Mother's home. *Id.* at 4. She and her daughter left because of the domestic violence over the past several years and were afraid of R.S. *Id.* Maternal aunt reported that on June 17, 2019, Mother found T.T.M.-C., J.E.M.-C., and another child engaged in behavior they had seen on YouTube. *Id.* Mother told maternal aunt to take E.T.M.-S. and S.T.M.-C. to the park while R.S. disciplined T.T.M.-C. and J.E.M.-C. *Id.* at 4-5.

On June 20, 2019, DHS was awarded protective custody of T.T.M.-C., J.E.M.-C., S.T.M.-C., E.T.M.-S. and, at a shelter care hearing the next day, the court determined that the children should remain in the custody of DHS. The children were adjudicated dependent in July 2019 and separately placed in kinship care. Although each child lived in multiple kinship and foster homes, they have remained in the custody of DHS during the pendency of these proceedings. On November 13, 2019, after an aggravated circumstances

- 4 -

hearing, the court found T.T.M.-C. was a victim of child abuse, and Mother and R.S. were found to be the perpetrators.

On February 28, 2023, DHS filed a petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a) and (b).[2] The trial court held a termination hearing on May 2, 2023, wherein DHS presented testimony of the community umbrella agency ("CUA") case manager, Destiny Vargas, and Dr. William Russell, and introduced the following stipulated exhibits: (1) proof of service on Mother; (2) curriculum vitae for Dr. Russell; (3) parenting capacity evaluation of Mother; (4) dependency docket for T.T.M.-C.; (5) dependency docket for S.T.M.-C.; (6) dependency docket for J.E.M.-C.; and (7) dependency docket for E.T.M.-S. N.T., 5/2/23, at 16-20. Mother testified on her own behalf. *Id.* at 78-97. The same day, the trial court entered decrees involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (8), and (b).[3]

On May 17, 2023, Mother filed a *pro se* notice of appeal and statement of errors complained of on appeal. As she was represented by private counsel, this Court directed private counsel to file an amended statement of errors

---

[2] Michael Graves, Jr., Esquire, was appointed as legal counsel for the children. N.T., 5/2/23, at 5. Jo-Ann Braverman, Esquire, served as guardian *ad litem* for J.E.M.-C., S.T.M.-C., and E.T.M.-S. *Id.* Lisa Visco, Esquire, served as guardian *ad litem* for T.T.M.-C. *Id.*

[3] The biological fathers voluntarily consented to terminating their parental rights and those decrees were entered on a different day.

complained of on appeal. Order, 6/9/23. On June 14, 2023, Mother's counsel filed a petition to withdraw representation. Thereafter, we directed the trial court to address counsel's petition to withdraw. Order, 6/20/23. On June 27, 2023, the trial court allowed private counsel to withdraw and appointed counsel for Mother. Thereafter, Mother's counsel filed an amended statement of errors complained of on appeal. Mother raises five issues for our review:

1. Whether the Trial Court committed an error of law and abuse of discretion when it found that the Department of Human Services by clear and convincing evidence had met its burden to terminate [Mother's] parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) and 23 Pa.C.S.A. § 2511(a)(8)?

2. Whether the Trial Court committed an error of law and abuse of discretion when it found that termination of [Mother's] parental rights was in the Child[ren]'s best interest and that the Department of Human Services had met its burden pursuant to 23 Pa.C.S.A. § 2511(b)?

3. Whether the Trial Court erred in evaluating [Mother's] level of compliance with her Family Single Case Plan Objectives?

4. Whether the Trial Court erred in its consideration of a stale Parenting Capacity Evaluation and in its reliance on any associated testimony?

5. Whether the Trial Court erred in its consideration of incompetent or inadmissible evidence?

Mother's Brief at 4.

Our standard of review in this context is well-settled:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an

appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotations omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interest of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (internal citations omitted). "We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *In re B.L.W.*, 843 A.2d 380, 383 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004) (citing *In re C.S.*, 761 A.2d 1197, 1199 (Pa. Super. 2000)).

Here, the trial court terminated Mother's parental rights pursuant to Section 2511(a)(2), (8), and (b). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm. *Id.* at 384. We begin our analysis with Section 2511(a)(2), which states:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2). "The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021), *appeal denied*, 258 A.3d 1144 (Pa. 2021). We emphasize that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *Id.* "A parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties." *B.L.W.*, 843 A.2d at 387-88.

Mother contends that DHS failed to prove by clear and convincing evidence that her conduct warranted termination under Section 2511(a)(2). Specifically, Mother asserts that she has "made tremendous strides at achieving her identified family [single case plan] goals and court ordered objectives." Mother's Brief at 13. Further, Mother argues that the record demonstrates her capacity to parent the children successfully due to "her achievement of full compliance and years of successful unsupervised visitation." *Id.* at 16. We disagree.

The trial court identified Mother's incapacity for the purposes of Section 2511(a)(2) as her lack of compliance with certain objectives, her failure to take responsibility for why the children went into care and her lack of insight as to how to manage the children's behavior and engage in appropriate discipline.[4] Trial Court Opinion, 8/14/23, at 21-22. The trial court placed great weight on Mother's lack of compliance. Mother's permanency plan objectives essentially remained the same for four years. N.T., 5/2/23, at 22-23. Initially, her objectives were to (1) attend ARC for parenting classes and follow all recommendations; (2) participate in supervised visits with the children; (3) participate in a parenting capacity evaluation ("PCE") when scheduled and follow all recommendations; (4) report for random drug screenings; and (5) continue to attend therapy and follow all

---

[4] The trial court specifically noted that its decision was not based on Mother's housing and employment objectives. Trial Court Opinion, 8/14/23, at 25.

recommendations. Trial Court Opinion, 8/14/23, at 7. She was initially scheduled to have two hours of supervised visitation at the agency.

Between July 2019 and June 2021, Mother achieved full compliance with her permanency plan objectives. She completed domestic violence counseling, parenting classes and the PCE, attended therapy, was consistent with visitation, and obtained appropriate housing. Mother progressed to weekly unsupervised visits and alternating weekend overnights with two children at a time (the two older and the two younger children together). Following the June 1, 2021 permanency review hearing, the court directed Mother to continue mental health treatment and provide the assigned CUA copies of her progress reports.

By May 2022, Mother's progress with her objectives regressed to minimal compliance and she made no progress toward alleviating the circumstances that led to placement. Mother had unsupervised visitation from December 2020 to May 2022[5]. The visits reverted to supervised due to the children's behavior during the visits and Mother's inability to control them. N.T., 5/2/23, at 24. Additionally, the children would misbehave when they returned to their foster homes. *Id.* at 24-25. Ms. Vargas supervised some visits and described them as chaotic. *Id.* at 25.

_____

[5] Ms. Vargas incorrectly testified that Mother's unsupervised visits terminated in June 2021. N.T., 5/2/23, at 41. The dependency docket reflects that Mother was permitted unsupervised visitation until May 2022.

Though the record is unclear why, T.T.M.-C. did not visit Mother with his siblings. T.T.M.-C.'s visits stopped in March 2023 after Mother bit him on the cheek while play fighting during a supervised visit. *Id.* at 26. However, he was already not attending visits regularly because he did not want to see Mother. *Id.* at 26-27. During her testimony, Mother downplayed the incident:

> He likes to play fight like, you know, boys do. And I did... I like grabbed. Like I bit – not like hard, obviously, because we play like that.
>
> I like grabbed his cheek and I guess he said it was too hard. I said, "Sorry." And I gave him a kiss. And everything was fine after that.

*Id.* at 79.

The other three children – J.E.M.-C., S.T.M.-C. and E.T.M.-S. attended visits with Mother together. Ms. Vargas testified that S.T.M.-C. and E.T.M.-S. frequently misbehaved during the visits and Mother was unable to control their behavior. *Id.* at 27. During visits, Mother was overly affectionate toward S.T.M.-C. and E.T.M.-S., always kissing and hugging them, but would not show the same affection toward J.E.M.-C. *Id.* at 27-28.

Though Mother only missed one visit, there were several concerns. She would get upset and yell at the children. *Id.* at 60-61. Mother explained: "I try to get help. And they don't help me. They don't tell me what I can and can't do. They don't like give me like references for anything. And I feel like they're just all – that no one wants to help me." *Id.* at 92. Mother was asked specifically what type of help she wanted, she answered "Anything. And they

lie." *Id.* Mother also told E.T.M.-S. to make allegations against his foster parent. *Id.* at 61-62.

Dr. William Russell conducted the PCE of Mother. To complete his evaluation, Dr. Russell reviewed the provided information, conducted a structured interview of Mother in October 2020 and a clinical evaluation of Mother in January 2021. *Id.* at 72. Dr. Russell concluded:

> [Mother] loves her children and can interact and play with them but cannot manage them. The records and **[Mother's] own statements** reflect a young woman who minimizes negative or irresponsible behavior, externalizes blame for her children's negative behavior and demonstrates no insight into her responsibility for the children's current emotional and behavioral problems.

Parenting Capacity Evaluation, 1/19/21, at 12 (emphasis added). He recommended Mother continue individual therapy, maintain contact with the children's treatment providers, obtain full-time employment, obtain appropriate housing separate from maternal grandmother and maternal aunt, and participate in family school with the children. *Id.* The goal of family school was to increase Mother's skill for managing the children's behavior and using appropriate discipline. *Id.* at 13.

Mother attended family school with S.T.M.-C. and E.T.M.-S. from November 1, 2022 through March 2, 2023. N.T., 5/2/23, at 33, 42. Family school was concerned with Mother's inability to discipline the children without prompting by staff. *Id.* at 33. They were also concerned with the lack of age-appropriate boundaries Mother had with the children and wanted her to be

- 12 -

more of an authority figure. *Id.* Due to lack of progress, Ms. Vargas requested family school to discharge Mother. *Id.* 33, 42.

Though Mother attended individual therapy, her therapist reported that she made no progress after 64 sessions. *Id.* at 29-30. Conversely, Mother believed she had made progress and explained:

> Me and my therapist talk all the time about – I know what I've done wrong. And like I would never do it again. And I talk to her all the time about stuff like that, things that happened.
>
> * * * *
>
> -- and nobody has had a conversation with my therapist either to ask her if I know how I feel and how, you know, like about the kids' feelings, and all of that. Nobody has ever said nothing.

*Id.* at 81-82. Mother did not have a report from her therapist stating that she made progress and became defensive when the guardian *ad litem* asked about it – "My therapist technically by law isn't allowed to tell y'all what goes on in detail in my sessions." *Id.* at 91. Mother and T.T.M.-C. attended six sessions of family therapy, which stopped due to T.T.M.-C.'s frustrations with Mother. *Id.* at 34.

Based on the foregoing, Ms. Vargas opined that Mother was not capable of caring for the children because she failed to realize how the children feel about the circumstances that led to placement and the trauma that they have experienced. *Id.* at 35. Further, Mother has not remedied the issues that brought the children into care. *Id.*

Dr. Russell testified as an expert[6] in forensic psychology with a specialty in PCEs, and explained:

> [T]here are significant problems with [Mother's] insight into her responsibility and her role in terms of why the children went into care. There are significant problems with her insight into what her children's needs were. And also the impact of her behavior and the domestic violence behavior on the development of these children.
>
> There was also a significant amount of blaming exhibited by [Mother]. That is blaming other people for the situation that they were in. It was – physical discipline by her was minimized. And blame was placed on her paramour.
>
> The issues related to the children's behavior, she blamed her mother and the aunt for not helping her with the children. And that's why they had so many problems. And [there] were also basic observations about the children where she simply said, "They're all bad. They lie. They don't listen."

*Id.* at 74-75. Dr. Russell opined that there were no additional services that would give Mother the capacity to safely parent the children. *Id.* at 76-77. She already participated in therapy, visitation and family school with little to no progress. *Id.* at 76. He elaborated:

> She has participated in some of [the recommendations]. However, the testimony that I heard prior certainly indicates that while she's participated in some of them, there has not been any significant progress in her development of further insight or into her responsibility and ability to handle the children.
>
> The behaviors that were described in terms of the inability to provide – to provide supervision and care for the children certainly raises questions as to whether there has been any change over the last three years in terms of her ability to do that.

---

[6] There was no objection to Dr. Russell testifying as an expert. N.T., 5/2/23, at 70.

*Id.* Therefore, Dr. Russell opined that Mother does not possess the capacity to provide safety for the children. *Id.*

Based on the foregoing, the record demonstrates that Mother's repeated and continued incapacity to comply with her permanency objectives due to her lack of insight, lack of responsibility and externalization of blame has caused T.T.M.-C., J.E.M.-C., S.T.M.-C., and E.T.M.-C. to be without essential parental care, control or subsistence necessary for their physical and mental well-being. There is a difference between participating in the objectives and recommendations, and actual progress. Here, there was no evidence that Mother progressed despite the number of services she was provided. Thus, the conditions and causes of Mother's incapacity and refusal cannot or will not be remedied. Therefore, the trial court did not abuse its discretion in terminating Mother's parental rights pursuant to Section 2511(a)(2).

We now turn to Section 2511(b), which states, in pertinent part:

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b). "Notably, courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent." *Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023). This determination "should not be applied mechanically,"

but "must be made on a case-by-case basis," wherein "the court must determine each child's specific needs." *Id.* at 1106.

Our Supreme Court has mandated that a Section 2511(b) analysis must include "consideration of the emotional bonds between the parent and child." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Thus, the court must determine whether the adverse impact of severing the parent-child bond "is outweighed by the benefit of moving the child toward a permanent home." *Id.* at 253.

> [B]y evaluating the impact of severance to determine if it will impose more than an adverse or detrimental impact, courts correctly refine their focus on the child's development and mental and emotional health rather than considering only the child's "feelings" or "affection" for the parent, which even badly abused and neglected children will retain.

*K.T.*, 296 A.3d at 1110. "The continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." *T.S.M.*, 71 A.3d at 267 (citing *In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008)).

However, "courts must not only consider the child's bond with the biological parent, but also examine the intangibles such as the love, comfort, security, and stability the child might have with the **foster** parent." *K.T.*, 296 A.3d at 1111 (emphasis in the original; internal citations and quotation marks omitted). Thus, courts should also consider factors that naturally arise due to the particular facts of a case, such as: (1) the child's need for permanency and time in foster care; (2) whether the child is in a pre-adoptive home and

- 16 -

bonded with foster parents; and (3) whether the foster home meets the child's needs. *Id.* at 1113.

Turning to the merits of Mother's appeal, she argues that the evidence was insufficient to terminate her parental rights because it is not clear that adoption was adequately explained to the children by their legal interest counsel. Mother's Brief at 42. She also contends that the court did not properly analyze the nature of the bond between Mother and the children. *Id.* at 44. We disagree.

Ms. Vargas testified that T.T.M.-C. and J.E.M.-C. do not have a bond with Mother. N.T., 5/2/23, at 35-36, 48. Conversely, she testified that while S.T.M.-C. and E.T.M.-S. do have a bond with Mother, it is an unhealthy one. *Id.* at 37-38, 50. As to T.T.M.-C., Ms. Vargas testified that he wants to be adopted and no longer wants a relationship with Mother. *Id.* at 36. T.T.M.-C. has been in his pre-adoptive home since April 7, 2021, and sees his foster parent as his mother. *Id.* He looks to his foster parent for love, protection and support, and the foster parent meets all of T.T.M.-C.'s needs. *Id.* at 36-37. T.T.M.-C. would not suffer irreparable harm if Mother's rights were terminated as he has expressed several times that he wants to be adopted. *Id.* at 37.

Likewise, J.E.M.-C. has expressed that she wants to be adopted. *Id.* at 48. She has been in her pre-adoptive home since May 17, 2021, and looks to her foster parents for love, protection, and support, and the foster parents

meet all of J.E.M.-C.'s needs. *Id.* She considers her foster parents as her parents. *Id.* J.E.M.-C. does individual therapy and is on the waitlist for trauma-based therapy because she still brings up the circumstances that brought the children into care. *Id.* at 55-56. She also takes ADHD medication. *Id.* at 55. J.E.M.-C. would not suffer irreparable harm if Mother's rights were terminated as she has expressed a desire to be adopted. *Id.* at 50.

As to S.T.M.-C., Ms. Vargas testified that she has an unhealthy bond with Mother. She explained that S.T.M.-C. is nine years old, she acts like a baby when around Mother, and a mature nine-year-old in her foster home. *Id.* at 38, 46. S.T.M.-C. has been in her pre-adoptive home since April 12, 2022. *Id.* at 46. She has been in five different foster homes and is most stable in her current placement. *Id.* at 60. S.T.M.-C. has behavioral issues, such as hitting other children in school, talking back and generally being disrespectful. *Id.* at 54. S.T.M.-C.'s behavior has **improved** since family school with Mother stopped, and she would not suffer irreparable harm if Mother's rights were terminated. *Id.* at 47, 54.

Similarly, Ms. Vargas testified that E.T.M.-S. has an unhealthy bond with Mother. She explained that E.T.M.-S. acts completely different with Mother than with his foster parent. *Id.* at 51. During visits, E.T.M.-S. would misbehave the entire time and would not listen to Mother. *Id.* E.T.M.-S. has been in his pre-adoptive home since October 16, 2020, and refers to his foster

parent as mom. *Id.* at 51-52. Despite his age, E.T.M.-S. is not ready for kindergarten because he cannot recognize his name nor identify the alphabet. *Id.* at 60. He is currently enrolled in Head Start and attends occupational and speech therapy. *Id.* at 57. E.T.M.-S. looks to his foster parent for love, protection and support and his foster parent meets all his needs, and would not suffer irreparable harm if Mother's rights were terminated. *Id.* at 52.

The children's legal interest counsel, Michael Graves, Esquire, provided a report to the court. *Id.* at 97-103. He reported that E.T.M.-S. is too young to have a substantive conversation about adoption. *Id.* at 98. E.T.M.-S. reported that he liked where he was, but also wanted to be with Mother. *Id.* As to the other three children, Attorney Graves reported that adoption was explained to them and they very clearly understood what it meant. *Id.* All three children expressed a desire to be adopted and did not want to be reunified with Mother. *Id.* at 103.

Based on the foregoing, we find no abuse of discretion or error of law in the trial court's holding that termination was warranted pursuant to Section 2511(b). Accordingly, we affirm the decrees terminating Mother's parental rights.[7]

---

[7] We find Mother's remaining issues to be waived. "[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, the claim is waived. It is not the obligation of this Court . . . to formulate Appellant's arguments for him." *Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009) (internal citations omitted).

Decrees affirmed.

Judge Bowes joins the memorandum.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/28/2024